3:25-mj-00178

**DISTRICT OF OREGON, ss:**                              **AFFIDAVIT OF NOLAN M. HANSEN**

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Nolan M. Hansen, being duly sworn, do hereby depose and state as follows:

### Introduction and Officer Background

1.      I have been employed as a Deputy Sheriff by the Washington County Sheriff's Office (WCSO) since August of 2016. I have been a sworn Task Force Officer with the Federal Bureau of Investigations (FBI) since February of 2024.  My current assignment is to the Westside Interagency Narcotics (WIN) Team.  Since becoming a law enforcement officer, I have received training and/or professional experience in narcotic investigations, familiarization with U.S. narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, informant development, Title III investigations, and undercover operations. During my law enforcement career, I have been involved in investigations of numerous federal and state criminal offenses.  I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major dealers.  These investigations have included the use of confidential sources (CSs), and sources of information (collectively "Sources"); toll records; physical surveillances; and the execution of search warrants.  These investigations have also included possession with intent to distribute, and distribution of controlled substances.  These investigations have resulted in numerous state and/or federal prosecutions of individuals who have possessed, and or distributed controlled substances, as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs.

2. I submit this affidavit in support of a criminal complaint and arrest warrant for:

    a. **Bayron Noe Cruz MURILLO,** date of birth July xx, 1994, (herein after referred to as **MURILLO**);

    b. **Rufilio Bleto BANEGAS,** date of birth July xx, 1984, (herein after referred to as **BANEGAS**); and,

    c. **Angel Salvador Cruz ZUNIGA,** date of birth September xx, 2003, (herein after referred to as **ZUNIGA**),

for committing the felony offense of engaging in a conspiracy to manufacture, distribute, and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (the "Target Offense").  As outlined below, I have probable cause to believe, and I do believe, that these individuals have committed the Target Offense.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## Applicable Law

4. Pursuant to 21 U.S.C. §§ 841(a)(1) and 846, it is unlawful for any person to conspire to manufacture, distribute, and possess with intent to distribute a controlled substance.

**Cooperating Defendants**

5.      This investigation involves the use of two cooperating defendants.  In March 2025, Investigators with the FBI and the Clackamas County Interagency Task Force (CCITF) spoke with a cooperating defendant (CD-1).  The CD-1 was taken into custody as a result of a fentanyl investigation in which they were a target of the investigation.  During a debrief of the CD-1, CD-1 stated they knew of a Honduran male, along with their brother, who were distributing large quantities of fentanyl in Portland, Oregon.  The CD-1 personally knew this Honduran male as "Bayron" later identified as **MURILLO**, who used to supply fentanyl to a close acquaintance of CD-1.  CD-1 believed they could be supplied by **MURILLO** and told Investigators that they could assist Investigators in ordering fentanyl.  CD-1 has provided actionable information to law enforcement in exchange for potential consideration on their pending criminal charges involving possession with intent to distribute fentanyl.  No threats, promises or guarantees were made by investigators to gain the CD-1's cooperation.  CD-1 has also provided information to Investigators against their own penal interests.  CD-1 has been involved in both using and selling fentanyl for more than five years.  CD-1 has no felony convictions but has been lodged on federal charges involving the possession of with intent to distribute a controlled substance (fentanyl).  CD-1 has provided Investigators information that they have been able to independently verify.  Based on the above information, I believe CD-1 to be reliable to the extent investigators have corroborated the CD-1's information, as detailed below.

6.	In June 2025, Investigators with the Washington County Interagency Narcotics Team (WIN) contacted another cooperating defendant (CD-2) during the execution of a federal search warrant. CD-2 has previously been arrested for Oregon State charges of Unlawful Possession of Methamphetamine, Unlawful Possession of Heroin, Theft in the Second Degree, and Parole Violation. CD-2 is currently cooperating for potential consideration on the following federal charges: 21 U.S.C. § 841(a)(1) and (b)(1)(C) involving the Distribution of Fentanyl, with the possibility of it resulting in a death. CD-2 has not been made any promises regarding the consideration they may or may not receive. CD-2 provided this information voluntarily and was not threatened or coerced. I believe CD-2 to be reliable to the extent investigators have corroborated CD-2's information, as detailed below

<u>Statement of Probable Cause</u>

<em>Background on Investigation – FBI & ITF Investigate MURILLO</em>

7.	During the month of March 2025, Investigators executed a search warrant at the CD-1's residence, which was within the District of Oregon. During a search of the CD-1's residence, Investigators located approximately 146 grams of suspected fentanyl, a Schedule II controlled substance. The suspected fentanyl was tested using a field-testing kit and the result was preemptively positive (+) for fentanyl.

8.	I know from my training and experience that the quantity of fentanyl seized from the CD-1's residence is consistent with a distributable quantity of fentanyl, and far more than personal use, which is generally consumed in quantities of less than a gram.

9.	After the search warrant execution of the CD-1's residence, Investigators fluent in Spanish, spoke with CD-1 in the Spanish language. During the interview, CD-1 stated they

knew of a Honduran male, known to CD-1 as "Bayron" and later identified as **MURILLO**, who was actively involved in the distribution of fentanyl in Portland, Oregon. CD-1 told Investigators that **MURILLO's** brother was also actively involved in the sales of fentanyl but was arrested on drug charges. CD-1 stated they knew **MURILLO** as he had supplied an acquaintance of CD-1 with fentanyl for purposes of further distribution. CD-1 told Investigators that **MURILLO** could supply a corner ("una esquina") of fentanyl, which was approximately 13 grams and up to a kilogram of fentanyl for $19,000. Based on my training experience, I know that a kilo of fentanyl being sold on the streets in Portland, Oregon goes for between $25,000 to $30,000. I also know that those who have access to large quantities of narcotics and involved in the distribution of these narcotics can set their own prices for larger orders to compete with other fentanyl dealers.

10.     Upon receiving this information and at the direction of Investigators, CD-1 messaged **MURILLO** via social media who responded back with a phone number of 360-232-2670 (**Target Cellphone 1**) in which to call back. Using coded language, CD-1 called and asked **MURILLO** if they were "making food" (which is code for the packaging and selling fentanyl) and **MURILLO** advised CD-1 that they were. CD-1 asked if they would sell CD-1 "a corner" (approximately 13 ounces of fentanyl), and **MURILLO** said they could. CD-1 inquired about a price and **MURILLO** told CD-1 "8" which I know from my training and experience to be $8,000 and to be consistent with fentanyl street prices. CD-1 asked if they could meet, and **MURILLO** told CD-1 they were "cooking" but would reach out when it was ready. Investigators, however, were not able to complete the deal above due to other investigations that were developing that day.

AFFIDAVIT OF NOLAN M. HANSEN                                                                                    Page 5

11. Based on the above and both CD-1's experience in fentanyl distribution, Investigators had reason to believe, and did believe that **MURILLO** was in possession of commercial quantities of fentanyl powder, a Schedule II controlled substance. Investigators also believed that **MURILLO'S** use of coded drug language and his ability to communicate further demonstrates his access and ability to distribute quantities of fentanyl.

### FBI & WIN Investigate BAYRON

12. In the first week of June 2025, as part of a separate and initially believed to be an unrelated investigation into a suspected drug overdose, Investigators served a search warrant on an individual's residence here in the greater Portland, Oregon metropolitan area. That individual was believed to be the person who sold fentanyl to the individual who used it and subsequently died. Following the execution of the search warrant, that individual, who subsequently became a cooperating defendant (CD-2), provided information regarding fentanyl trafficking occurring in the District of Oregon, specifically within the city of Portland, Oregon.

13. CD-2 told investigators he/she purchased fentanyl from an unidentified Honduran national who went by the moniker "Cruz," who was later identified as **MURILLO**. CD-2 said they contacted **MURILLO** to purchase fentanyl by cellphone through voice call and text message. CD-2 told investigators that **MURILLO'S** assigned phone number was 503-480-4906 (**Target Cellphone 2**). CD-2 said they purchased fentanyl from **MURILLO** approximately five (5) times here within the greater Portland, Oregon metropolitan area. CD-2 said they had personally met with **MURILLO** to purchase fentanyl, as well as met with drug runners that were delivering CD-2's fentanyl order on behalf of **MURILLO**. Each time CD-2 met with **MURILLO** or his runners, CD-2 always met with a person driving a silver Mercedes.

14.     CD-2 consented to investigators reviewing the contents of his/her cellphone. Investigators reviewed the text message conversations between the CD-2 and **Target Cellphone 2**. Investigators saw messages, in coded language that CD-2 decoded, where fentanyl amounts, prices, and deal locations in the city of Portland, and the surrounding metropolitan area, were all discussed between CD-2 and the user of **Target Cellphone 2**. The conversations that Investigators reviewed took place in May of 2025. For example, on May 20, 2025, the CD-2 texted **Target Cellphone 2** asking for an eight ball (represented by a black 8 billiard ball) of fentanyl, which is approximately 3.5 grams (1/8th of an ounce), to which **MURILLO** replied "200," which both CD-2 and I know to be a reference to $200 dollars. I know this amount is consistent, but a little high, with the street prices of fentanyl in the greater Portland, Oregon metropolitan area. The text exchange is below:



15.     CD-2 confirmed that they had supplied fentanyl to the deceased and that specific fentanyl was purchased by CD-2 from **MURILLO**. CD-2 told Investigators he/she contacted

AFFIDAVIT OF NOLAN M. HANSEN                                                                 Page 7

**Target Cellphone 2** to organize the drug deal with **MURILLO** and that they then met near a public shopping area inside of Clackamas County, Oregon, in the first half of May 2025. Investigators reviewed the specific deal outlined in text messages between CD-2 and **MURILLO**. Based upon this information, Investigators visited the public shopping area and found security camera footage that captured and recorded the drug transaction between CD-2 and **MURILLO**. Investigators observed **MURILLO** operating a 2009 silver Mercedes C-class series, with Oregon license plate 449PTQ, before and after the drug transaction. After reviewing the security footage, Investigators were also able to identify **MURILLO** as the person CD-1 had identified as "Bayron." CD-2 was also shown a photograph of **MURILLO** and CD-2 confirmed that was the subject they knew as "Cruz" and who they purchased fentanyl from.

## *Execution of Search Warrants*

16.     On June 23, 2025, based upon information gathered over the course of the investigation, Investigators applied for and the Honorable Jolie A. Russo, United States Magistrate Judge, District of Oregon, authorized, search warrants for **MURILLO**'s residence, located at The White Willow Apartments, 11616 SE Division Street, Apartment XX, Portland, Oregon (the **Target Residence**), as well as the 2009 silver Mercedes C-class series, with Oregon license plate 449PTQ (the **Subject Vehicle**).

17.     On June 26, 2025, Investigators served the search warrants. Inside the **Target Residence** Investigators located **MURILLO**, **BANEGAS,** and **ZUNIGA**. The **Target Residence** is a small one-bedroom apartment with a living room area by the front door, then a kitchen area, and in the back of the apartment is a bedroom. The bathroom is located between

the kitchen area and back bedroom. There were beds in both the front living room and in the back bedroom.

### *Seized Fentanyl*

18.     Inside the **Target Residence** Investigators located fentanyl in multiple locations. Inside the kitchen, Investigators found a cardboard box that was inside the warming drawer of the oven. Inside the box were twenty-two plastic baggies, each containing what appeared to be roughly the same quantity of multiple round blue pills inscribed with M30. From my training and experience I know these pills to be counterfeit M30 Oxycodone pills that are manufactured with fentanyl (also sometimes called fentanyl pills). A sample of the pills tested presumptive positive for fentanyl, a Schedule II controlled substance, on a Detectachem field test kit. I know from my training and experience that field tests are a reliable method for testing controlled substances with subsequent forensic analysis repeatedly confirm the results. The weight of these pills, in the original packaging, was approximately 248.5 grams. The pills are shown below:



19.     Investigators then removed the warming drawer of the oven and located a brick of pressed white powder in the void space under the oven. The powder was seized and a sample tested presumptive positive for fentanyl on a Detectachem field test kit. The weight of the powder was approximately 333.8 grams. The powder fentanyl is depicted below:



20.     In the kitchen sink Investigators found a plastic box that contained five baggies of the same blue M30 pills, which tested presumptive positive for fentanyl on a Detectachem field test kit, weighing approximately 65.1 grams, in the original packaging; four baggies of a white powder which also tested presumptive positive for fentanyl on a Detectachem field test kit, weighing approximately 24.5 grams, in the original packaging; and, one baggie of purple powder, which tested presumptive positive for fentanyl on a Detectachem field test kit, weighing 2.2 grams in the original packaging. These items are depicted below:

///

///

AFFIDAVIT OF NOLAN M. HANSEN                                                                                   Page 10



21.     At the bottom of a trash can located in the kitchen, Investigators also located approximately 107.3 grams of white powder, which tested presumptive positive for fentanyl on a Detectachem field test kit.  It is depicted below:



22.    From the **Target Residence**, in total, Investigators seized approximately 781.4 grams of substances, in both pill and powder form, that tested positive for fentanyl.

*Equipment Related to the Manufacture of Fentanyl*

23.    Inside **Target Residence** Investigators also located multiple items related to the manufacture of fentanyl.  In the living room area of the **Target Residence** Investigators located a large metal press with a hydraulic jack, and pressing plates as well.   From my training and experience I know that a press like this is often be used for pressing powdered fentanyl, often after being mixed with Mannitol to increase the volume of material, into a larger brick for purposes of further distribution.  In a box in the kitchen of the **Target Residence** investigators also located three respirators, which from my training and experience I know to be common safety gear during the manufacture of powdered fentanyl; a pair of goggles; a large digital scale with white powder residue on it; a thirty-five ounce tub of Mannitol, which I know from my training and experience to be a common cutting agent used for manufacturing powdered fentanyl; and, a small digital scale.  Since most drug dealing is based upon selling a particular weight of a controlled substance for a particular price, I know that drug dealers regular use scales to weigh their controlled substances for sale.  Under the bathroom sink of the **Target Residence** Investigators located a Bullet blender with white powder residue coating it.  From my training and experience I know Bullet blenders to be a common tool for breaking apart concentrated bricks of powdered fentanyl and mixing it with cutting agents, such as Mannitol.  Some of these items are shown below:

///





*Seizure of Cash*

24.     In the hallway closet of the **Target Residence** Investigators located $3,021 in U.S. Currency.  In the bedroom Investigators located $10,976 in U.S. Currency.  In **MURILLO'S** pockets I located $1,300 in U.S. Currency.  In total $15,297 was located.  Based on my training and experience I know drug dealing is more often than not done in cash

transactions. The large amount of cash is consistent with drug dealing. Some of the cash seized is depicted below:





*Interviews*

25. When they were taken into custody, **MURILLO**, **BANEGAS**, and **ZUNIGA** all stated they did not speak English. Spanish speaking Investigators were then used to help interview the three subjects. All three subjects were advised on their constitutional *Miranda* rights in Spanish and acknowledged understanding their rights.

26. **MURILLO** was interviewed and admitted that he sells controlled substances, to include fentanyl. **MURILLO** stated he purchases the fentanyl in powder form for $600 an

ounce and in pill form for fifty cents a pill. **MURILLO** identified a Motorola cellphone that was found on the bathroom floor as his and stated it contained drug related communications. During the interview, **MURILLO** showed me text message communications, which were in coded language, in which he told me he was ordering 5,000 blue M30 pills.

27. I asked **MURILLO** if he remembered any of the deals he made with CD-2. **MURILLO** stated he did not. I showed **MURILLO** a still picture of himself and **BANEGAS** at the shopping center in Clackamas, Oregon shortly after the interaction with CD-2. **MURILLO** confirmed it was **BANEGAS** and himself in the picture. **MURILLO** stated sells drugs daily, that is why he was unable to remember a specific deal on that day.

28. **MURILLO** identified another grey Motorola cellphone, which had been found in a laundry hamper in the bedroom, that this was the phone he used to communicate with his customers. I reviewed messages on the phone and was able to confirm there were numerous text message conversations consistent with customers ordering controlled substances. The phone **MURILLO** identified as his customer phone was the phone we knew as **Target Cellphone 2.**

29. I asked **MURILLO** why there was three respirators in the **Target Residence.** **MURILLO** stated "they" used the respirators while manufacturing the powdered fentanyl. When I asked **MURILLO** if "they" meant **BANEGAS** and **ZUNIGA**, **MURILLO** replied he can only speak about what belongs to him and would not identify who the other masks belonged to. **MURILLO** also said that he wouldn't say anything about the others because they are all cousins. **MURILLO** stated he sleeps in the bedroom of the **Target Residence** and **BANEGAS** and **ZUNIGA** both sleep in the living room area, which is where the press and press plates were found.

30. Next, I interviewed **BANEGAS**, who claimed he did not sell controlled substances or assist anyone else with their selling or manufacturing of controlled substances. **BANEGAS** stated **MURILLO** sells fentanyl, and he routinely goes with **MURILLO** to the drug deals, but claimed he did not assist in any way. **BANEGAS** also said that he wouldn't say anything more about the others because they are all cousins. I showed **BANEGAS** the still picture of **MURILLO** and himself during the day of the deal with CD-2. **BANEGAS** confirmed it was him in the picture, but stated he could not remember if **MURILLO** conducted any drug deals that day. **BANEGAS** confirmed he sleeps in the living room of the **Target Residence** with **ZUNIGA** and **MURILLO** sleeps in the bedroom.

31. **ZUNIGA** refused to speak with Investigators.

### *Training and Experience*

32. I know that fentanyl is a Schedule II controlled substance and an extremely powerful synthetic opioid that is approximately 100 times more potent than morphine and 50 times more potent than heroin. I know that 2 mg. of fentanyl can be a potentially fatal dose. I know that fentanyl traffickers regularly buy bulk fentanyl powder and bulk quantities of fentanyl pills (counterfeit M30 pills manufactured with fentanyl) that they in turn break down into smaller amounts for further distribution. I know a typical user of fentanyl will either buy powdered fentanyl or counterfeit M30 pills that they will then burn it on a piece of tin foil and inhale the fumes. Sometimes a user will simply ingest the pills or inhale the powdered fentanyl. I know that fentanyl addicts on the street do not regularly stockpile large amounts of fentanyl but rather tend to buy a small amount of what they need and then resupply themselves when they run out. I know that a user of powdered fentanyl will use it in quantities of less than 1/10 of a gram and

will regularly buy it in amounts of less than a gram up to a couple of grams at a time. I also know that a fentanyl pill roughly weighs around 1/10 of a gram. I know that users of fentanyl pills will regularly buy a small quantity of pills, one to 25 pills at a time, and then use/burn one at a time. I know that dealers of powdered fentanyl will often buy fentanyl in larger quantities and then break off and sell it in smaller qualities of a gram or less. I know that a person possessing more than 25 grams of fentanyl powder or 25 grams of fentanyl pills does not possess the fentanyl for personal use but rather such a quantity indicates that it is possessed for purposes of further distribution.

33.     Based upon the large quantity of fentanyl and the drug manufacturing equipment located within the shared areas of the **Target Residence**; the presence of three respirators in the kitchen of the **Target Residence**, which would allow one for each of the three occupants of the apartment; **MURILLO**'s statement that "they" used the respirators while manufacturing the powdered fentanyl; and, CD-2's observations of multiple subjects working with **MURILLO**, I believe more likely than not **MURILLO**, **BANEGAS**, and **ZUNIGA** conspired together to manufacture, distribute, and possess with intent to distribute fentanyl.

## Conclusion

34.     Based on the foregoing, I have probable cause to believe, and I do believe, that **MURILLO**, **BANEGAS**, and **ZUNIGA** have committed the crime of conspiracy to manufacture, distribute, and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. I therefore request that the Court issue a criminal complaint and arrest warrant for **MURILLO**, **BANEGAS**, and **ZUNIGA**.

35.     Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the arrest warrant were all reviewed by Assistant United States Attorney Scott Kerin. AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Nolan M. Hansen
Task Force Officer
Federal Bureau of Investigations

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at  6:19 pm  a.m./p.m. on June   27  , 2025.

*Youlee Yim You*
HONORABLE YOULEE YIM YOU
UNITED STATES MAGISTRATE JUDGE